**UNITED STATES of America**

v.

**BOSTON & MAINE RAILROAD and D'Arrigo Bros. Co. of Massachusetts.**

**Civ. A. No. 57–530.**

United States District Court
D. Massachusetts.

Dec. 19, 1957.

Anthony Julian, U. S. Atty., Andrew A. Caffrey, Asst. U. S. Atty., Boston, Mass., for plaintiff.

Arthur L. Brown, Salvatore E. Aloisi, Boston, Mass., for defendants.

ALDRICH, District Judge.

This is an action brought by the United States Attorney for the District, acting for and under the direction of the Attorney General of the United States, at the request of the Interstate Commerce Commission. The purpose is to enjoin a proposed sale by the defendant railroad, hereinafter called the defendant, under an agreement dated February 23, 1956, of land in Cambridge, Massachusetts to the defendant D'Arrigo Bros. Co., a Massachusetts corporation, hereinafter called the buyer. Jurisdiction is invoked under § 3 of the Elkins Act, 49 U.S.C.A. § 43, and under the general laws relating to suits in equity arising under the provisions of the Constitution and laws of the United States. I find the facts to be in accord with several partial stipulations of the parties in court, written and oral. For the sake of this opinion some of the undisputed facts will be simplified.

In 1952 the defendant, as a result of the abandonment of a branch line, found itself in possession of a piece of property adjoining its main line for which it had no further use. This property, hereinafter called the locus, was of some 7.4 acres, or approximately 320,000 square feet. It was irregular in shape, some 1,600 feet long, and of varying widths. It was zoned for industrial purposes. Although back land, it had free access to an accepted street over a 40' wide easement. At one end it was swampy, and probably all of it was incapable of supporting heavy industrial buildings without driving piles. The water table was high, and there were drainage problems. In addition, areas totalling some 58,000 feet were crossed by a small, but somewhat noisome brook, and by underground sewers, for which there were three separate easements. Nevertheless the property was not without value, and comparable, or somewhat comparable adjacent property had sold at varying prices, from 5.8 cents a foot in the 1940's to 20 cents a foot in the 1950's.

In 1953 the defendant determined to sell the locus, and listed it with several brokers. It stated, however, that it was unwilling to sell to any one who would not be a potential freight customer. I find that not only was it unwilling to sell to any one who would not produce freight custom, but that even there it had to be satisfied of a substantial minimum quantity of potential shipments. At no time did defendant endeavor to find a buyer on the basis of the highest price it could ob-

tain for the land without consideration of the use to which it was to be put. The argument that defendant makes that it endeavored to get the highest dollar, while no doubt true with reference to this particular buyer, must be taken in this frame of reference.

While this may have been a wise business practice, apart from the statute, from the operational standpoint of the railroad, it was not conducive to obtaining the full fair market value of the property. This is borne out by what developed. In February, 1956, the defendant contracted to sell the locus to the buyer for $44,000. As part of the agreement the defendant obligated itself to arrange for the enclosure of the brook in a 6′ concrete pipe, at a cost to it of $48,000, and to relocate telegraph wires and make other improvements, at a further cost to it that proved to be in excess of $30,000. The agreement was conditioned on the buyer's handling certain minimum annual freight shipments over a period of five years, with the option in the defendant, if it failed to do so, to reacquire the property upon repayment of the purchase price, with various adjustments.

There was a dispute in the testimony as to the value of the locus. There can be no dispute, however, as to the fact that it had an appreciable value in February, 1956, and that, as part of the contract of sale, the defendant assumed direct financial obligations nearly twice the gross amount of the sales price. In return for this the defendant received, if not a promise, at least a somewhat secured hope of substantial freight business. The government contends that the sale under these circumstances constituted a rebate to, or unlawful discrimination in favor of, the buyer, as a freight customer. The defendant replies that in spite of all of the expenditures it made on the property, the cash price agreed to by the buyer was the full fair value of the locus even in its improved state, and that the buyer received no bonus. The government replies that even if this were so, which it disputes, the agreement as a whole was improper, cf. United States v. General Motors, 3 Cir., 226 F.2d 745, and, if only for punishment, the court, in the exercise of its equity powers, should enjoin its consummation. I do not reach this question, made particularly interesting by the fact that the defendant did not even consider all shippers in its potential list of customers. See Union Pacific R. Co. v. United States, 313 U.S. 450, 462, 61 S.Ct. 1064, 85 L.Ed. 1453. Obviously there are many limits to what a railroad can do in the way of promotion. Its expenditures can not be too remote, cf. Davis v. Old Colony R. Co., 131 Mass. 258; neither can they be too direct, viz., rebates or discrimination. The government's secondary legal contention in regard to the latter need not be decided, because I find as a fact that the property in its present, improved state is and was fairly worth no less than $60,000.[1] There was no direct evidence of what the defendant thought was, or would be, the fair market value of the property, or even that it gave the matter any consideration. I find that the defendant, if it did not actually realize that the buyer would be receiving the improved locus for substantially less than its fair value, was at least consciously indifferent to whether it would or not, but thought the transaction was nevertheless a desirable one from the defendant's standpoint because of the future expected freight revenue. Under these circumstances the government is clearly entitled to an injunction. Unless there is agreement, I will hear the parties as to the form of relief.

1. It is not necessary to decide how much more. I do observe that I was less than fully impressed with the valuation given by the government's expert.